STATE OF NORTH CAROLINA v. MICHAEL SCOTT SISTLER

No. COA11-1035

(Filed 17 January 2012)

**1. Homicide—first-degree murder—motion to dismiss—sufficiency of evidence—premeditation—deliberation—malice**

The trial court did not err by denying defendant's motions to dismiss the first-degree murder charge at the close of the State's evidence and at the close of all evidence. There was substantial evidence that defendant acted with premeditation, deliberation, and malice. Further, defendant did not act in self-defense.

**2. Criminal Law—motion for mistrial—reference to suppressed evidence—trial court steps to mitigate**

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion for a mistrial after the prosecutor allegedly referred to suppressed evidence. The suppression order did not constitute a complete ban on all evidence pertaining to defendant's location when he fired the shotgun. Further, the trial court took steps to mitigate the impact of the prosecutor's statement by sustaining defendant's objection and instructing the jury to disregard it.

**3. Appeal and Error—preservation of issues—untimely objection—failure to state specific grounds for objection**

Although defendant contended that the trial court erred in a first-degree murder case by overruling his objection and motion to strike a witness's testimony concerning defendant's location when the witness heard the shotgun blast, defendant waived review of this issue by failing to object to the challenged testimony in a timely manner. Even if the objection was timely, defense counsel failed to state the specific grounds for the objection.

**4. Criminal Law—prosecutor's argument—right to enter home revoked—law enforcement could have helped**

The trial court did not commit plain error in a first-degree murder case by failing to intervene *ex mero motu* during the prosecutor's closing argument allegedly insinuating that defendant's right to enter a home had been revoked or by overruling defendant's objection after the prosecutor stated defendant could have

called law enforcement to help him retrieve his clothes from the residence. The consent issue was immaterial, and the law enforcement statement was grounded in reason and common sense.

Appeal by Defendant from judgment entered 17 March 2011 by Judge Robert F. Floyd, Jr. in Johnston County Superior Court. Heard in the Court of Appeals 30 November 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General L. Michael Dodd, for the State.*

*Marilyn G. Ozer for Defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Michael Scott Sistler ("Defendant") appeals his conviction for first-degree murder. On appeal, Defendant contends the trial court erred by denying his motions to dismiss the first-degree murder charge at the close of the State's evidence and the close of all the evidence, and by denying Defendant's motion for a mistrial after the prosecutor allegedly referred to evidence suppressed by a pre-trial suppression order. Defendant also argues the trial court erred by overruling his objections and motions to strike portions of the State's rebuttal evidence. Finally, Defendant contends the trial court committed plain error by failing to intervene *ex mero motu* during the prosecutor's allegedly improper closing arguments and further erred by overruling Defendant's objection to a separate portion of the prosecutor's closing arguments. After careful review, we find no error.

## I. Factual & Procedural Background

The State's evidence at trial tended to show the following. On the night of 28 December 2008, Joseph Heyden, Richard Charlton, and Kristy Brown sat in the living room of Ms. Brown's mobile home, drinking and watching television. Mr. Charlton and Ms. Brown sat together on the couch, and Mr. Heyden sat on a loveseat nearby. Mr. Charlton and Ms. Brown were dating, and Mr. Charlton kept some of his personal possessions in Ms. Brown's home, including a Grendel .380 semiautomatic pistol. Mr. Heyden was a friend of Mr. Charlton visiting for the evening.

At approximately 9:15 PM, Ms. Brown noticed headlights outside of her home and observed a vehicle enter her driveway. She watched as her ex-boyfriend, Defendant, emerged from his vehicle with a 12-gauge pump shotgun. Ms. Brown had not invited Defendant to her

home that evening. In a panic, she struggled to lock the front door and yelled to Mr. Charlton and Mr. Heyden: "He's got a gun."

Ms. Brown and Mr. Charlton fled from the living room area, down a hallway, to the master bedroom in the rear of the home. Mr. Charlton grabbed his semiautomatic pistol on his way to the bedroom. Mr. Heyden crouched behind a counter in the kitchen area adjoining the living room. Defendant entered through the front door, shouting vulgarities. He carried a sawed-off shotgun at his hip. Mr. Heyden observed Defendant move through the living room, past the kitchen area, and point the shotgun down the hallway leading to the master bedroom. Mr. Heyden heard a shotgun blast immediately after losing sight of Defendant. Mr. Heyden headed for the front door and exited the home. Ms. Brown pushed her way past Defendant in the hallway and went out the front door not far behind Mr. Heyden. Mr. Heyden and Ms. Brown heard several more gunshots, one from the shotgun and three or four from the semiautomatic pistol owned by Mr. Charlton.

Once outside, Mr. Heyden called 911. Ms. Brown joined Mr. Heyden in the front yard as he placed the call. Mr. Heyden went back inside the house to check on Mr. Charlton. He saw Defendant "shot up" and stationary on the floor of the hallway. There was a trail of blood leading from Defendant to the master bedroom. Mr. Heyden found Mr. Charlton on the floor of the bedroom. Mr. Charlton's chest was bloody and he had no pulse.

Deputy Sheriff Patrick Medlin of the Johnston County Sheriff's office was the first law enforcement officer to arrive at the scene at approximately 9:42 PM. He observed Mr. Heyden and Ms. Brown standing in the front yard of Ms. Brown's residence and noted three vehicles in the driveway. Ms. Brown informed Officer Medlin of two gunshot victims inside the residence. Officer Medlin entered the residence and immediately noticed Defendant lying face down in the hallway. Defendant was bleeding badly and barely breathing. Officer Medlin also noticed a blood trail leading from the hallway to a bedroom in the rear of the mobile home. He found Mr. Charlton not breathing and bleeding badly from a chest wound. Officer Medlin observed Defendant's shotgun on the floor of the bedroom to the left of Mr. Charlton and Mr. Charlton's pistol on the opposite side of the room. EMS arrived and rendered medical assistance to Defendant. Mr. Charlton was pronounced dead at the scene.

On 12 January 2009, a Johnston County Grand Jury indicted Defendant on one count of first-degree murder and one count of first-degree burglary. A superseding indictment was later issued on the first-degree burglary charge, removing reference to first-degree murder as the underlying felony. On 15 September 2010, Defendant notified the State of his intent to raise self-defense as a defense to both charges.

On 15 October 2010, the State sent the shotgun recovered from the crime scene to the State Bureau of Investigation ("SBI") for ballistics testing to determine the distance from which the shotgun was fired when the first shotgun blast struck the wall approximately five feet from the entrance of the master bedroom. The SBI report indicated the shotgun was fired "from a distance greater than 14 feet but less than 18 feet." The State averred this report demonstrated that, due to the dimensions of the bedroom, Defendant must have fired the shotgun outside of the bedroom. On 3 December 2010, Defendant moved to suppress this evidence. As trial was set for 10 January 2011, defense counsel contended he had insufficient time to prepare in light of this new evidence. Johnston County Superior Court Judge Thomas H. Lock agreed, and, on 7 January 2011, Judge Lock entered an order granting Defendant's motion to suppress the SBI's testing and results obtained therefrom (hereinafter referred to as the "Suppression Order"). The Suppression Order prohibited the State from referring to the shotgun firing distance testing either directly or through the testimony of its witnesses. The trial date was delayed from 10 January 2011 to 7 March 2011 due to inclement weather, prompting the State to file a motion with the trial court to reconsider the Suppression Order. Judge Lock denied the State's motion.

This matter came on for trial at the 7 March 2011 Criminal Session of the Johnston County Superior Court, the Honorable Robert F. Floyd presiding. At trial, Mr. Heyden testified as a witness for the State. Mr. Heyden testified he saw Defendant point the shotgun down the hallway and heard a shotgun blast the moment he lost sight of Defendant. According to Mr. Heyden, it was not until he exited Ms. Brown's home that he heard the semiautomatic pistol fire several times. When pressed on cross-examination, Mr. Heyden stated he was "sure" he heard the shotgun blast prior to the firing of the semiautomatic pistol. He testified he was able to distinguish between the shotgun and the pistol because he had "shot pistols and shotguns and rifles pretty much [his] whole life," he had personally fired Mr. Charlton's pistol, and he was well aware of the sound of a shotgun when fired, as he had fired a shotgun hundreds of times.

Ronald Mazur, a crime scene investigator with the Johnston County Sheriff's office, described the layout of Ms. Brown's mobile home and the location of the evidence collected by investigators at the crime scene. During the course of direct examination, the prosecutor stated: "There was testimony in this case that a shot was fired from a shotgun in the hallway of the residence." Defense counsel objected to the prosecutor's statement and, out of the presence of the jury, moved for a mistrial. Defense counsel contended the prosecutor's statement assumed matters not in evidence because no witness had testified to actually seeing Defendant fire a gunshot down the hallway and, moreover, the prosecutor's statement elicited testimony in violation of the Suppression Order. The trial court sustained the objection and directed the jury to disregard the statement. The trial court denied Defendant's motion for a mistrial, but "admonished [the State] not to argue or presume matters that are not yet in evidence."

John D. Butts, the medical examiner who performed the autopsy on Mr. Charlton, testified that Mr. Charlton died as a result of a shotgun wound to his left chest region. When asked on cross-examination whether Mr. Charlton would have been able to fire a gun *after* sustaining the shotgun wound, Dr. Butts testified "Mr. Charlton would have lost consciousness rather rapidly, but he could well have been conscious and capable of a few voluntary efforts for a brief period of time before he lost consciousness."

Defense counsel moved to dismiss the charges against Defendant at the close of the State's evidence, asserting the State had failed to offer evidence sufficient to prove each element of the charged offenses. With respect to the murder charge, Defendant contended that the State had introduced no evidence indicating Defendant's permission to enter Ms. Brown's residence had been revoked and that the only evidence indicating Defendant had pulled the trigger was circumstantial. The court denied Defendant's motions.

Ms. Brown testified as a witness on Defendant's behalf. She stated she had been in a romantic relationship with Defendant for approximately eighteen months. They were not "boyfriend and girlfriend," but they did spend Christmas Eve together just a few nights prior to the night in question. According to Ms. Brown, Defendant had "standing consent" to come and go from Ms. Brown's residence. Ms. Brown testified that she was also romantically involved with Mr. Charlton. Mr. Charlton stayed with Ms. Brown at her residence from 26 December 2008 through the time of his death. When Ms. Brown saw Defendant outside of her home on the night of 28 December

2008, she tried to stop Defendant from seeing inside because she did not want Defendant to see her with Mr. Charlton. At the sight of Defendant's shotgun, she feared for the safety of both men because she knew Mr. Charlton was also armed.

Ms. Brown testified that Defendant entered through the front door into the living room area. Ms. Brown and Mr. Charlton headed for the master bedroom in the rear of the trailer, and Defendant followed. Mr. Charlton pointed his pistol at Defendant as Defendant entered the bedroom. Defendant held his shotgun pointed straight ahead with his hand on the pump. Ms. Brown left the bedroom and heard gunfire. She did not know how many shots had been fired, or who fired first. Ms. Brown "about ran over" Mr. Heyden on her way to the front door. After the shooting ceased, Ms. Brown reentered the residence and found Defendant crawling through the kitchen area. Defendant stated to Ms. Brown: "Baby, he shot me first." Ms. Brown found Mr. Charlton lying beside the bed in the master bedroom.

On cross-examination, Ms. Brown testified she received threatening text messages from Defendant earlier that night. Ms. Brown read to the jury the following text message exchange, which transpired at approximately 7:45 PM:

DEFENDANT: "Fuck you, you slut. You want to fuck Nigger [Mr. Charlton] on Christmas. Fuck you. I hope you die."

MS. BROWN: "What the fuck ever, you drama queen. I didn't fuck [Mr. Charlton] on Christmas Day. Don't be ugly to me. Mean people suck udders."

DEFENDANT: "Fuck you. You're a fucking liar. I wish you both die. I hate you."

Defendant took the stand and testified in his own defense. He described the text messages between himself and Ms. Brown as the way they communicated when they were not getting along, and he was just "messing around" with her. Defendant testified he went to Ms. Brown's residence that night because he was leaving town for work and needed to pick up some clothes. When Defendant arrived at Ms. Brown's residence, he noticed a vehicle in the driveway that he believed to be Mr. Charlton's truck. According to Defendant, he grabbed his shotgun for his own protection. Defendant explained that Mr. Charlton had assaulted him in the past, and Defendant knew that Mr. Charlton "carried a pistol with him at all times." Defendant entered Ms. Brown's residence through the front door with the shot-

gun "as a deterrent." Mr. Charlton was in the living room and Mr. Heyden was in the kitchen. Defendant told Mr. Charlton he didn't want any trouble and was just there to pick up some clothes. Defendant followed Mr. Charlton down the hallway to the master bedroom at the rear of the residence. When they reached the bedroom, Mr. Charlton "spun around and was training his pistol on [Defendant]."[1] Defendant raised his arm and was about to yell, "Don't shoot" when Mr. Charlton opened fire. The bullet penetrated Defendant's arm, and, stumbling backwards, he pumped the shotgun. Defendant "knew he was trying to kill me then." After sustaining a second gunshot wound, Defendant looked away—to avoid being shot in the face—and pulled the trigger on his shotgun. The shooting stopped. Defendant fell to the ground and saw Mr. Charlton, eyes open, propped up against the bed. Defendant did not know if Mr. Charlton was dead. Defendant crawled out of the bedroom and collapsed in the hallway when he was unable to drag himself further.

The defense also introduced the testimony of Defendant's former girlfriend, Teresa Thomas. Ms. Thomas testified that a fight had occurred between Defendant and Mr. Charlton in 2003 after Mr. Charlton slapped Ms. Thomas on the butt at a party. According to Ms. Brown, Defendant "got beat up really bad," was knocked unconscious, and required stitches to his forehead.

The State called Mr. Heyden as a rebuttal witness. Mr. Heyden described to the jury, using a diagram depicting the layout of Ms. Brown's apartment, where he was when he heard the shotgun blast and where he thought Defendant might have been. Defense counsel objected and moved to strike Mr. Heyden's testimony. The trial court overruled the objection and the motion to strike.

Defendant renewed his motions to dismiss the charges against Defendant at the close of all the evidence. The trial court granted Defendant's motion as to the first-degree burglary charge based on its finding that Defendant had standing consent to enter Ms. Brown's residence, and the State had failed to offer sufficient evidence establishing that this consent had been withdrawn. The trial court denied Defendant's motion to dismiss the first-degree murder charge.

During closing arguments, the prosecutor portrayed Defendant as a man tired of losing to Mr. Charlton, referencing both the fight in

---

1. Although it is unclear from the transcript, Defendant's testimony indicates Ms. Brown was in or around the bedroom at this time, but fled up the hallway when Mr. Charlton pointed his gun at Defendant.

2003 and Mr. Charlton's relationship with Defendant's ex-girlfriend, Ms. Brown. In light of the text message exchange between Defendant and Ms. Brown and Ms. Brown's relationship with Mr. Charlton, the prosecutor argued, Defendant knew "that his right to go into [Ms. Brown's] house ha[d] been revoked." The prosecutor emphasized that the facts indicated Ms. Brown revoked Defendant's "standing consent" to enter her home on the night in question. Defendant raised no objection. The prosecutor accused Defendant of possessing an "outlaw mentality:" instead of attempting to obtain his clothes from Ms. Brown's home peacefully, Defendant carried a loaded shotgun into Ms. Brown's home with the intent to kill Mr. Charlton. At this point, defense counsel objected to the prosecutor's closing argument. The trial court overruled Defendant's objection.

On 17 March 2011, the jury convicted Defendant of first-degree murder. Judge Floyd sentenced Defendant to the mandatory sentence of life in prison without parole. At the conclusion of sentencing, Defendant entered notice of appeal in open court.

## II. Jurisdiction

This Court exercises jurisdiction over Defendant's appeal pursuant to N.C. Gen. Stat. § 7A-27(b), as Defendant appeals from the superior court's final judgment as a matter of right.

## III. Analysis

### A. Defendant's Motion to Dismiss

[1] The first issue presented for this Court's review is whether the trial court erred by denying Defendant's motions to dismiss the first-degree murder charge at the close of the State's evidence and at the close of all the evidence. Defendant contends he is entitled to a new trial under *State v. Corn*, 303 N.C. 293, 278 S.E.2d 221 (1981) because the trial court erred in submitting first-degree murder as a possible verdict to the jury. We disagree and hold that the trial court did not err in denying Defendant's motion to dismiss the first-degree murder charge.

"When ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The trial court should grant the defendant's motion to dismiss

"[i]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it." *State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982).

"The elements required for conviction of first degree murder are (1) the unlawful killing of another human being; (2) with malice; and (3) with premeditation and deliberation." *State v. Haynesworth*, 146 N.C. App. 523, 531, 553 S.E.2d 103, 109 (2001). In determining whether substantial evidence of each element exists, this Court must view the evidence presented before the trial court in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). Conflicting testimony, contradictions, and discrepancies are factual determinations to be resolved by the jury and do not require dismissal. *State v. Prush*, 185 N.C. App. 472, 478, 648 S.E.2d 556, 560 (2007). However, whether substantial evidence exists with respect to each element of the charged offense is a question of law. *State v. Stephens*, 244 N.C. 380, 384, 93 S.E.2d 431, 433 (1956). Accordingly, we review the trial court's denial of Defendant's motion to dismiss *de novo*. *See State v. McNeil*, ___ N.C. App. ___, ___, 707 S.E.2d 674, 679 (2011).

Defendant concedes he fired the gunshot that killed Mr. Charlton. Defendant's sole contention is that his actions were justified under a theory of self-defense and the State failed to carry its burden in proving otherwise. The law of perfect self-defense excuses a killing if, at the time of the killing: (1) the defendant subjectively believed it necessary to kill the deceased to preserve his own life or to avoid substantial bodily injury; (2) the defendant's belief was objectively reasonable; (3) the defendant was not the initial aggressor; and (4) the amount of force employed by the defendant was reasonably necessary under the circumstances to protect himself. *State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992). In *State v. Hamilton*, this Court stated:

> The State bears the burden of proving that defendant did not act in self-defense. To survive a motion to dismiss, the State must therefore present sufficient substantial evidence which, when taken in the light most favorable to the State, is sufficient to convince a rational trier of fact that defendant did not act in self-defense.

77 N.C. App. 506, 513, 335 S.E.2d 506, 511 (1985) (internal citation omitted).

Viewing the evidence in the light most favorable to the State, Defendant drove to Ms. Brown's residence, uninvited, after sending threatening text messages to Ms. Brown expressing anger towards Ms. Brown and her relationship with Mr. Charlton. Defendant saw Mr. Charlton's vehicle in the driveway and grabbed his loaded, sawed off shotgun. Wielding the shotgun, Defendant entered Ms. Brown's home. Defendant moved through the living room, past the kitchen area, and down the hallway where he opened fire in the direction of Mr. Charlton and the master bedroom. Mr. Charlton died as a result of a shotgun wound to his chest. Mr. Charlton was able to fire off several rounds with his pistol before succumbing to his injuries. We hold this to be substantial evidence from which a jury could find Defendant acted with premeditation, deliberation, and malice, and, further, is sufficient evidence to convince a rational jury that Defendant did not act in self-defense.

Defendant avers "[a]ll of the evidence at trial showed [Defendant] was shot twice before he fired the fatal shot," and, therefore, the State failed to carry its burden in proving Defendant's conduct was not justified. Defendant's contention ignores Mr. Heyden's testimony indicating Defendant fired the first shot. Mr. Heyden testified he heard a shotgun blast when he was in the kitchen, immediately after losing sight of Defendant. It was not until he ran from the kitchen and out the front door that he heard shots fired from Mr. Charlton's pistol. Mr. Heyden confirmed he was "sure" he heard the shotgun first when pressed on cross-examination. Defendant's contention also ignores Dr. Butts' testimony acknowledging that it would have been possible for Mr. Charlton to fire his pistol after sustaining the shotgun blast.

Defendant points to the testimony of Ms. Brown and Defendant indicating Mr. Charlton fired the first shot, and Defendant returned fire to preserve his own life. According to Defendant, this testimony indicates that the State failed to prove beyond a reasonable doubt that Defendant did not act in self-defense. Defendant misconstrues our standard of review on this issue. While it may be true that a jury could infer Defendant acted in self-defense based upon the evidence presented at trial, we are required to view the evidence in the light most favorable to the State in reviewing the trial court's ruling on Defendant's motion to dismiss. *See supra.* Defendant's evidence is considered only to the extent it is favorable to the State. *State v. Streath*, 73 N.C. App. 546, 552, 327 S.E.2d 240, 243 (1985). We conclude that the evidence, when viewed in the light most favorable to the State, is sufficient to convince a rational jury that Defendant did

not act in self-defense. The conflicting evidence presented at trial concerning, *e.g.*, who fired the first shot and whether Defendant fired the shotgun in the hallway or in the bedroom, left material questions of fact to be resolved by the jury. It was not the function of the trial court to make these determinations in ruling on Defendant's motion to dismiss. *See Powell*, 299 N.C. at 99, 261 S.E.2d at 117 (holding that upon considering a motion to dismiss, the trial court "is concerned only with the sufficiency of the evidence to carry the case to the jury and not with its weight"). We hold there was sufficient evidence to submit to the jury the charge of first-degree murder and the trial court did not err in denying Defendant's motion to dismiss. Defendant's assignment of error is overruled.

## B. Defendant's Motion for a Mistrial

**[2]** Defendant next contends the trial court erred by denying his motion for a mistrial after the prosecutor allegedly referred to suppressed evidence. We disagree and hold that the trial court acted within its discretion in denying Defendant's motion.

We review the trial court's denial of Defendant's motion for a mistrial for abuse of discretion. *See State v. Simmons*, 191 N.C. App. 224, 227, 662 S.E.2d 559, 561 (2008). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *State v. Lasiter*, 361 N.C. 299, 302, 643 S.E.2d 909, 911 (2007).

"The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C. Gen. Stat. § 15A-1061 (2009). "Mistrial is a drastic remedy, warranted only for such serious improprieties as would make it impossible to attain a fair and impartial verdict." *State v. Stocks*, 319 N.C. 437, 441, 355 S.E.2d 492, 494 (1987). " 'Ordinarily, when incompetent or objectionable evidence is withdrawn from the jury's consideration by appropriate instructions from the trial judge, any error in the admission of the evidence is cured.' " *See State v. Upchurch*, 332 N.C. 439, 450, 421 S.E.2d 577, 584 (1992) (citation omitted).

STATE v. SISTLER

[218 N.C. App. 60 (2012)]

Here, the prosecutor made the following statement during the State's direct examination of Mr. Mazur: "There was testimony in this case that a shot was fired from a shotgun in the hallway of the residence." We agree with Defendant that the prosecutor's statement was misleading. Mr. Heyden testified he heard the shotgun blast as Defendant moved out of his line of vision into the hallway; he did not testify to actually seeing Defendant fire the shotgun in the hallway. Nor did any other witness at trial testify that the shotgun was fired in the hallway. While the jury may have inferred from Mr. Heyden's testimony that Defendant fired the shotgun in the hallway, the prosecutor's statement assumed matters not in evidence. However, the trial court took steps to mitigate the impact of the statement on the jury by sustaining Defendant's objection to the statement and instructing the jury to disregard it.

Defendant further contends the trial court erred in denying his motion for a mistrial because the prosecutor's statement violated the Suppression Order. We disagree. The Suppression Order prohibited the State from introducing testimony relating to the SBI's testing and the results obtained from the testing. The Suppression Order did not constitute a complete ban on all evidence pertaining to Defendant's location when he fired the shotgun. The prosecutor's statement improperly implied that Mr. Heyden observed Defendant fire the shotgun in the hallway, but it did not refer to the SBI testing. Thus, the prosecutor's statement did not violate the Suppression Order. In light of the trial court's instruction to the jury and our conclusion that the prosecutor did not violate the Suppression Order, we hold that the trial court acted within its discretion in denying Defendant's motion for a mistrial.

## C. Defendant's Objections and Motions to Strike

[3] After the defense rested its case, the State called Mr. Heyden as a rebuttal witness. During Mr. Heyden's testimony, the prosecutor asked Mr. Heyden to step down from the witness stand and identify—using a diagram of Ms. Brown's residence—where he believed Defendant was located at the time he heard the first shotgun blast. The following exchange took place:

> [PROSECUTOR]: And where was the defendant when you heard that sound?
>
> [MR. HEYDEN]: He would have been just past this point here (indicating [on the diagram]).

[PROSECUTOR]: Thank you.

(Witness resumes the stand.)

[PROSECUTOR]: Mr. Heyden, how long had you known Richard Charlton?

[DEFENSE COUNSEL]: Your Honor, I would object to the last question, object to his answer, and move the jury to strike it.

THE COURT: Overruled at this point.

[PROSECUTOR]: How long have you know Richard Charlton?

[MR. HEYDEN]: Almost 20 years.

THE COURT: And the motion to strike is denied at this point.

Defendant contends the trial court erred by overruling his objection and motion to strike Mr. Heyden's testimony concerning Defendant's location when Mr. Heyden heard the shotgun blast. Defendant asserts this testimony was speculative and deprived him of his right to a fair trial. We do not address the merits of Defendant's argument because Defendant failed to object to the challenged testimony in a timely manner.

"Assignments of error are generally not considered on appellate review unless an appropriate and timely objection was entered." *State v. Curry*, 171 N.C. App. 568, 573, 615 S.E.2d 327, 331 (2005). "[U]nder Rule 103 of the North Carolina Rules of Evidence, error may not be predicated on a ruling admitting evidence unless a *timely objection or motion to strike* appears in the record." *State v. Reid*, 322 N.C. 309, 312, 367 S.E.2d 672, 674 (1988) (emphasis added). Where the defendant has " 'the opportunity to learn that the evidence was objectionable,' " but fails to object, "he waives the inadmissibility of the evidence." *State v. Potts*, ___ N.C. App. ___, ___, 702 S.E.2d 360, 363 (2010) (citation omitted).

In *State v. Heyder*, the State's witness read into evidence an out of court statement made by the defendant. 100 N.C. App. 270, 274-75, 396 S.E.2d 86, 88-89 (1990). As the witness was reading the statement, defense counsel objected and moved to strike the testimony. *Id.* at 275, 396 S.E.2d at 89. The trial court overruled the objection. *Id.* On appeal, the defendant argued the trial court erred by overruling the objection and motion to strike because the entire statement was hearsay. *Id.* This Court held that "the defendant did not object in apt time" because "the defendant was fully aware throughout the reading

of the statement that it was an out-of-court statement offered for the truth of the matters contained within it." *Id.* at 275-76, 396 S.E.2d at 89. Accordingly, we held the defendant had failed to preserve the alleged error for appeal. *Id.* at 276, 396 S.E.2d at 89.

In the instant case, the record indicates Defendant failed to raise a timely objection to the challenged testimony. Mr. Heyden stepped down from the witness stand and used a diagram of Ms. Brown's residence to indicate to the jury where he believed Defendant to be when he heard the shotgun blast. Defendant did not object. Mr. Heyden returned to the witness stand. The prosecutor then proceeded with Mr. Heyden's testimony, stating: "Mr. Heyden, how long had you known Mr. Charlton?" It was only at this point that Defendant lodged an objection. While it is impossible to surmise from the transcript the precise period of time that had elapsed, this progression of events indicates Defendant failed to object to the challenged testimony in a timely manner.

Furthermore, even if the objection was timely, we further note defense counsel failed to state the specific grounds for the objection. "In order to preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, *stating the specific grounds for the ruling sought if the specific grounds are not apparent." State v. Eason,* 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991) (emphasis added); *see* N.C. R. App. P. 10(b)(1). Here, defense counsel did not state the grounds for the objection and, further, the transcript indicates potential confusion as to what Defendant was objecting. Defense counsel objected to the prosecutor's "last question." However, the "last question" posed by the prosecutor was "Mr. Heyden, how long had you known Mr. Charlton?" It was not until *after* Mr. Heyden answered this question, stating he had known Mr. Charlton for "20 years," that the trial court overruled defense counsel's motion to strike. Accordingly, we hold that defense counsel's objection was untimely and lacked the requisite precision, and, therefore, Defendant failed to preserve this issue for appellate review.

We have reviewed Defendant's remaining contentions with respect to the objections and motions lodged by defense counsel during the course of Mr. Heyden's rebuttal testimony and find no error in the trial court's rulings.

## D. The State's Closing Arguments

[4] Defendant's final contentions take issue with the prosecutor's closing arguments. During her closing arguments, the prosecutor

reminded the jury of the threatening text messages sent by Defendant to Ms. Brown, the violent history between Defendant and Mr. Charlton, and Mr. Charlton's relationship with Ms. Brown. The prosecutor then stated:

> And so when he goes into that house—the defendant would never admit to this, but he knows that his right to go into that house has been revoked. And he knows that because, again, of the text messages, he knows she's sleeping with another man. He's called her a slut. He's mad at her. A reasonable person, after saying those types of things, would never think you could walk into a woman's house when she was with another man.

Defendant did not object. Later, the prosecutor explained to the jury that it was their job to weigh the testimony of the witnesses and determine the credibility of those witnesses, including Mr. Heyden and Ms. Brown. The prosecutor then stated:

> I would submit to you that the truth is the same yesterday as it is today and as it will be tomorrow. And you cannot do that when you look at Kristy Brown's statement in this case because she said one thing the night of the murder, that she shut the door in the defendant's face as he's coming up to her house with a gun, and she gets on the stand and she testifies that he had consent, "He had standing consent to enter my residence." Is that reasonable to believe, members of the jury? That when she shut the door in his face she wants him to come in the house when she knew he had a shotgun. It's not reasonable to assume.

Again, Defendant did not object.

On appeal, Defendant contends the prosecutor's insinuation that Defendant's right to enter Ms. Brown's home had been revoked improperly contravened the trial court's earlier ruling on the issue of consent. At the close of all the evidence, the trial court dismissed the charge of first-degree burglary against Defendant, stating:

> I just don't see where there's been sufficient evidence shown that she has indicated through her testimony that the standing consent or the consent to—specific intent to come and go into the home, there's no evidence through her indicating that that was negated in her opinion.

In light of the trial court's ruling, Defendant contends the prosecutor's remarks during closing arguments prejudiced Defendant's right to a fair trial and the trial court committed plain error by failing

to intervene *ex mero motu*. Because Defendant failed to object at trial, this Court must determine whether the prosecutor's remarks were "so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v. Barden*, 356 N.C. 316, 358, 572 S.E.2d 108, 135 (2002).

N.C. Gen. Stat § 15A-1230 provides:

> During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230(a) (2009). As our Supreme Court has explained, the trial court must intervene during closing arguments only where "the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998); *see also State v. Paul*, 58 N.C. App. 723, 725, 294 S.E.2d 762, 763 (1982) ("Defendant is entitled to a new trial only if the impropriety is shown to be prejudicial.").

After careful review of the record, we conclude the prosecutor's remarks did not impede Defendant's right to a fair trial. The prosecutor's closing arguments asked the jury to infer from the circumstances that Ms. Brown revoked Defendant's permission to enter her home. The prosecutor also encouraged the jury to evaluate the credibility of Ms. Brown's testimony: on one hand, Ms. Brown testified Defendant had "standing consent" to enter her home; on the other hand, Ms. Brown testified she did not want Defendant to see her with Mr. Charlton and slammed the door in Defendant's face. Even assuming the prosecutor's remarks possessed some degree of impropriety in light of the trial court's earlier ruling, we cannot conclude these remarks impeded Defendant's right to a fair trial. As the burglary charge had been dismissed, the issue of whether Defendant had consent to enter Ms. Brown's home had little practical bearing on the jury's verdict as to the first-degree murder charge. Defendant's means of entry is immaterial if he shot and killed Mr. Charlton with premeditation, deliberation, and malice.

Defendant also contends the trial court erred when it overruled Defendant's objection after the prosecutor stated Defendant could

have called law enforcement to help him retrieve his clothes from Ms. Brown's residence. Defendant did object to this portion of the prosecutor's closing arguments, and we review the trial court's ruling for abuse of discretion. *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002).

"During closing arguments, trial counsel is allowed 'wide latitude' in his remarks to the jury and may argue the law, all the facts in evidence, and any reasonable inference drawn from the law and facts." *State v. Anderson*, 175 N.C. App. 444, 452, 624 S.E.2d 393, 400 (2006). The thrust of Defendant's argument is that the prosecutor's statement "was a calculated attempt to mislead the jurors." We disagree with Defendant's characterization of this portion of the prosecutor's closing arguments. The prosecutor posed a statement to the jury grounded in reason and common sense: if Defendant needed to obtain his personal possessions from Ms. Brown's residence, there were ways of doing so without resorting to violence. We hold the trial court was within its discretion in allowing the prosecutor's statement.

For the foregoing reasons, we conclude Defendant received a fair trial free from prejudicial error.

No error.

Judges HUNTER, Robert C., and GEER concur.