An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-965

Filed 6 May 2026

Columbus County, Nos. 21CR052802-230, 24CR000027-230, 24CR000115-230

STATE OF NORTH CAROLINA

v.

LEROY MOORE, JR.

Appeal by defendant from judgments entered 12 September 2024 by Judge Jason C. Disbrow in Columbus County Superior Court. Heard in the Court of Appeals 24 March 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Meghan E. Lock, for the State.*

> *Rosenberg Law Firm, by Jonathan Rosenberg, Pro Hac Vice, and Parry Law Firm, by Edward Eldred, for the defendant.*

WOOD, Judge.

Leroy Moore, Jr. ("Defendant") appeals from judgments entered following jury verdicts finding him guilty of first-degree murder, possession of a firearm by a felon, felony obstructing justice, and two counts of felony solicitation to intimidate a witness. On appeal, Defendant contends the trial court erred by: (1) denying

Defendant's motion to dismiss the charges for first-degree murder, obstruction, and solicitation; (2) admitting dying declarations; and (3) precluding the cross-examination of a witness concerning his criminal charges. After careful review of the record, we conclude Defendant received a fair trial free from error.

## I. Factual and Procedural Background

On 25 October 2021, Whiteville Police Department responded to a series of 911 calls reporting a "shootout" at the Sandy Ridge Apartments in Whiteville, North Carolina. Corporal Vann Brock ("Corporal Brock") was the first to respond, and when he arrived at the scene, he saw a Chrysler 300 sedan still running but stuck in a ditch to the left of the road. Corporal Brock and his training officer heard a person crashing through the woods nearby but did not give chase because of limited lighting and unknown conditions. As the officers began clearing the apartment complex, a Chrysler Pacifica minivan raced out of the parking lot. Bystanders in that area reported someone had been shot and was being rushed to the hospital in the minivan. Corporal Brock radioed for another officer to follow the minivan to secure that part of the crime scene.

Tony Baker ("Baker") was taken in the Chrysler Pacifica minivan to Columbus Regional Hospital where he was stabilized before being transported via helicopter to New Hanover Regional Hospital. Baker ultimately died from his injuries on 26 October 2021. An autopsy confirmed Baker succumbed to two perforating gunshot wounds that entered his left back and exited through his left chest and center chest.

At the Sandy Ridge Apartments, Whiteville police finished clearing the apartment complex and blocked off crime scene areas. They found shell casings from 9-millimeter and .40 caliber pistols as well as 7.62 by 39 and .223 rifles. Additionally, officers noted blood on the ground. The State Bureau of Investigations ("SBI") was called in to evaluate the crime scene. In addition to the shell casings, the SBI collected an AK-47 rifle, a left red Nike shoe size 8.5, multiple cell phones, a belt, multiple gun magazines, a left red Air Jordan shoe size 10, a black Nike sneaker size 10.5, car keys, a wallet containing Defendant's identification, and numerous projectiles.

On 26 October 2021, Defendant presented at UNC Health Southeastern in Lumberton, North Carolina for treatment of a headache. He gave medical personnel the name Eustance Hunter and reported he had been at a party when shooting broke out and now he could not get rid of a headache. The triage nurse inspected his head and identified a gunshot wound on the left side of his head with some slight bleeding. After CT scans, medical providers confirmed a gunshot wound in the left side of Defendant's brain and a skull fracture. The charge nurse from UNC contacted 911 according to protocol for all gunshot wounds. Defendant was transferred to Cape Fear Valley Hospital ("CFVH") for further treatment. After receiving an additional CT scan, and against medical advice, Defendant left the hospital before law enforcement responded.

On 23 November 2021, a warrant was issued for Defendant for the first-degree murder of Baker. On 7 February 2024, another warrant was issued for Defendant for possession of a firearm by a felon. Defendant came on for trial in February 2024; however, the trial ended in a mistrial.

On 8 May 2024, Defendant was indicted on additional charges, one count of obstructing justice and two counts of solicitation to intimidate a witness, for his allegedly calling to request a third-party to "contact" witnesses from the first trial.

Defendant's new trial on the first-degree murder and firearm charges along with the additional obstruction of justice and intimidation of witness charges, was held from 26 August through 12 September 2024.

The State presented significant evidence, including the testimony of twenty-three witnesses and more than 350 exhibits. The lead detective, SBI crime scene examiners, an FBI technology expert, and medical professionals all testified. In addition, Katrina Huggins ("Katrina"), the mother of Baker's child, and her father Russell Huggins ("Russell") both testified as eyewitnesses to the shooting.

Russell testified that after Baker was shot he "staggered" past Russell's front door. Russell asked if he was okay, and Baker replied, "I got shot." Russell asked who shot him, and Baker replied "June." Numerous witnesses referred to Defendant by his nickname, "June," throughout their testimony.

Katrina testified that during the shooting she looked out her bedroom window and saw June near the car with a gun. She did not see his face because of his mask,

but she recognized him by his body and how he moved. After the shooting Katrina exited her apartment and then saw Baker collapsed on her sister's front steps. She and her sister got Baker up and into her sister's minivan. Katrina rode in the back with Baker while her sister drove to the hospital. Katrina stated Baker was in and out of consciousness during the drive but had told her that June had shot him "with a chopper."

Shannon Hunt ("Hunt"), a former military officer and inmate in Defendant's pod at the Columbus County Jail, testified for the State. Hunt testified he built some trust with Defendant by helping with his investments and that Defendant began sharing details regarding the murder. According to Hunt, Defendant told him he had dropped a gun at the scene and that his motive for the shooting was a debt. Hunt also testified that he overheard conversations between Defendant and his cousin, who was also in the pod, about how Defendant had rented a vehicle to target Baker and planned to either get his money or kill him.

Columbus County Sheriff's Office Detective Michael Strickland testified concerning a call Defendant made from jail in March 2024 during which he requested someone that was coming in from out of town "speak with" witnesses in this case.

Defendant also presented evidence but did not testify at trial. Defendant's witness, Shawn Murchison ("Murchison"), informed the court that testifying was "against [his] religion" because he was "a gang member" but he was willing to help, to ensure "y'all get the truth." He testified both he and Baker were members of the

Bloods gang. They were together at Sandy Ridge on the day of the shooting playing dice and smoking weed with a group of men. He stated that a car pulled in and Defendant got out of the back passenger seat and walked towards the dice game. According to Murchison, Defendant was not wearing a mask and did not have anything in his hands. He testified that Marquez Cherry, a member of the dice game and Katrina's brother, pulled out a revolver and shot twice at Defendant from approximately twenty-five feet away but missed, then Defendant fled. He stated everybody began running and it was like World War III. He testified that the two people in the car with Defendant started "unloading some big stuff" or firing higher powered rifles.

On cross-examination Murchison admitted that his commonly known nickname with the Bloods was "Murk." The State's attorney asked Murchison if he was aware that Defendant had testified during the February 2024 hearing that he rode to the apartment complex with "Murk" and that "Murk" was one of the shooters that night. Murchison stated that he was not aware and it was not him in the car. Murchison also testified that Baker did not have a gun the night of the shooting; however, the prosecutor pointed out Defendant had testified that Baker had a gun and shot at him first.

Defendant also called another witness, Imani Mitchell, who lived in Sandy Ridge Apartments at the time of the shooting. Her testimony was consistent with Murchison's recollection of events. Additionally, Doctor Raj Patel testified for the

Defense that in his opinion Baker's ability to walk and talk would have been significantly compromised by his gunshot injuries. This testimony contradicted previous testimony from the medical examiner who stated that even with his wounds, Baker may have been able to move and talk for at least a short time as she had seen trauma victims do some amazing things.

On rebuttal, the State tendered the transcript of Defendant's testimony from the first trial in which, among other contrasting statements, Defendant had placed himself at the apartment complex at the time of the murder and had stated that Baker had a gun and fired first.

On 12 September 2024, the jury found Defendant guilty on all counts. Defendant was sentenced to life in prison without parole for the murder and an additional 17-30 months for possession of a firearm, obstruction, and solicitation to intimidate witnesses.

Defendant gave notice of appeal on 16 September 2024.

## II.    Analysis

Defendant raises three issues on appeal. Defendant contends the trial court erred by: (1) denying Defendant's motion to dismiss the charges for first-degree murder, obstruction, and solicitation; (2) admitting dying declarations; and (3) precluding the cross-examination of a witness concerning his criminal charges.

**A. Motion to Dismiss**

Defendant contends the State failed to establish beyond a reasonable doubt that Defendant was guilty of first-degree murder, obstruction of justice, and solicitation of a witness and, therefore, the trial court erred by denying Defendant's motion to dismiss. We disagree and note that "beyond a reasonable doubt" is not the standard the trial court considers in evaluating a motion to dismiss.

> In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator. Substantial evidence is the amount necessary to persuade a rational juror to accept a conclusion. In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. In other words, if the record developed at trial contains substantial evidence, whether direct or circumstantial, or a combination, to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied. Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo.

*State v. Golder*, 374 N.C. 238, 249–50, 839 S.E.2d 782, 790 (2020) (cleaned up).

**1. First-Degree Murder**

"The elements required for conviction of first-degree murder are (1) the unlawful killing of another human being; (2) with malice; and (3) with premeditation and deliberation." *State v. Sistler*, 218 N.C. App. 60, 68, 720 S.E.2d 809, 815 (2012)

(quoting *State v. Haynesworth*, 146 N.C. App. 523, 531, 553 S.E.2d 103, 109 (2001)). Defendant contends there was no evidence of malice or premeditation. We disagree.

"[I]t is well-established that '[t]he intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice.'" *State v. Bruton*, 165 N.C. App. 801, 806, 600 S.E.2d 49, 53 (2004) (quoting *State v. Bullard,* 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984)). Additionally, courts consider different factors when evaluating the "totality of the circumstances" to determine if premeditation and deliberation exist. *State v. Walker*, 286 N.C. App. 438, 442, 880 S.E.2d 731, 736 (2022). These factors can include:

> (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the occurrence giving rise to the victim's death; (4) ill-will or previous difficulty between the parties; (5) evidence that the killing was done in a brutal manner; and (6) the nature and number of the victim's wounds.

*Id.*

When evaluated in the light most favorable to the State, the State clearly presented evidence to meet both elements. The crime scene evidence demonstrated at least thirty-six rifle rounds from two different rifles were discharged within close proximity to the location of Defendant's car. Katrina and Russell both testified they saw gunfire coming from Defendant's direction, evidencing Defendant's use of a deadly weapon. Additionally, the State presented evidence that Defendant rented a car, dressed in black with his face covered, raced into the complex, and began firing

without provocation, striking Baker twice in the back and risking the lives of everyone in the vicinity. Although Defendant contests this evidence, "[c]onflicting testimony, contradictions, and discrepancies are factual determinations to be resolved by the jury and do not require dismissal" of the charges. *State v. Sistler*, 218 N.C. App. 60, 68, 720 S.E.2d 809, 815 (2012). The State clearly presented sufficient evidence of all of the elements necessary for first-degree murder. The trial court did not err in denying Defendant's motion to dismiss.

**2. Obstruction of Justice**

"At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice. The common law offense of obstructing public justice may take a variety of forms . . ." *In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983) and "obstructing a judicial proceeding would also fall within obstruction of justice." *State v. Coffey*, 292 N.C. App. 463, 468, 898 S.E.2d 359, 363 (2024), *appeal dismissed, review denied,* 901 S.E.2d 796 (N.C. 2024).

> Our Supreme Court has held the elements of felony common law obstruction of justice are: (1) the defendant unlawfully and willfully; (2) obstructed justice; (3) with deceit and intent to defraud. Our courts have defined common law obstruction of justice as any act which prevents, obstructs, impedes or hinders public or legal justice.

*Id.* at 468, 898 S.E.2d at 362-63. Recently, our Supreme Court went on to explain "obstruction of justice merely requires a showing that a defendant acts to stymie law enforcement's progress or otherwise stall an investigation of a matter. The success

of a defendant's obstruction efforts is not an element of the offense." *State v. Ford*, 388 N.C. 713, 723, 923 S.E.2d 549, 557 (2025). Therefore, "evidence of his efforts was enough to support the obstruction of justice charge." *Id*.

In the light most favorable to the State, Defendant called an unknown man and began discussing his trial. During the discussion he talked about "folks" trying to "do [him] dirty." He referenced witnesses from the trial suddenly remembering things and stated that they had lied. He requested the individual speak with the two witnesses. The man stated he would take care of it and Defendant clarified, "I'm trying to make sure that don't happen no more."

Defendant contends there is insufficient evidence that Defendant had the intent or did in fact obstruct justice. However, as set forth in our Supreme Court's ruling in *Ford,* the evidence supports a reasonable inference by the jury that Defendant sent someone to "talk" with the "folks" trying to "do [him] dirty" in order to obstruct a judicial proceeding by using intimidation to keep the witness from testifying or testifying truthfully. The success of that person is irrelevant. The trial court did not err in denying the motion to dismiss.

**3. Solicitation of Another to Intimidate a Witness**

Intimidating or interfering with a witness is defined by statute.

> If any person shall by threats, menaces or in any other manner intimidate or attempt to intimidate any person who is summoned or acting as a witness in any of the courts of this State, or prevent or deter, or attempt to prevent or deter any person summoned or acting as such witness from

> attendance upon such court, he shall be guilty of a Class G felony.

N.C. Gen. Stat. § 14–226(a). Solicitation has been defined "as counseling, enticing or inducing another to commit a crime. Solicitation is a specific-intent crime, and the offense is complete upon the request. Thus, the crime is committed even though the solicitation is of no effect and the crime solicited is never committed." *State v. Smith*, 269 N.C. App. 100, 101, 837 S.E.2d 166, 167 (2019) (cleaned up).

Defendant contends because the State did not prove he threatened the two witnesses with bodily harm, the facts were not sufficient to support the charge. However, Defendant misunderstands solicitation. Solicitation does not require the defendant to complete the harm himself, nor does it even require that the harm ever be completed by anyone. Solicitation requires that a defendant counsel, entice or induce someone to commit a crime, and the request itself is enough. *Id.* Therefore, in the light most favorable to the State, the phone call discussed above was sufficient evidence for the jury to consider whether Defendant induced the unknown caller to intimidate the witnesses in any way. The trial court did not err in denying the motion to dismiss.

**B. Dying Declaration**

Defendant next contends the trial court erred by admitting Baker's dying declarations to Russell and Katrina. However, not only did Defendant not object to the testimony at trial, on cross-examination he independently elicited testimony

about the dying declarations. Additionally, Defendant now fails to present an argument for plain error as required for evidentiary errors not objected to at the trial court. N.C. R. App. P. 10(a)(4).

Our Supreme Court has clearly held that regardless of whether the admission of evidence was error, "defendant waived his right to appellate review of this issue because he failed to object when [the individuals] testified." *State v. Dennison*, 359 N.C. 312, 312, 608 S.E.2d 756, 757 (2005). Furthermore, "because defendant did not 'specifically and distinctly' allege plain error as required by North Carolina Rule of Appellate Procedure 10(c)(4), defendant is not entitled to plain error review of this issue." *Id.* at 312–13, 608 S.E.2d at 757. We deem this issue to be waived on review.

**C. Cross-Examination**

Finally, Defendant contends the trial court erred by limiting the cross-examination of Hunt. Defendant contends he should have been permitted to question Hunt about whether he lied or was untruthful with law enforcement when he was first charged with production of child pornography. We disagree.

On appeal, a trial court's limitation on cross-examination is reviewed under an abuse of discretion standard. *State v. Bowman*, 372 N.C. 439, 444, 831 S.E.2d 316, 319 (2019). "[A] trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (quoting *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59

(1986)). Additionally, if the trial court abused its discretion, this Court must conduct a harmless error analysis. *See State v. McClinton*, __ N.C. App. __, __, 922 S.E.2d 190, 197 (2025).

In the case *sub judice,* Hunt was a jail house witness for the State. At the time of Defendant's trial, Hunt had pleaded guilty and was incarcerated on federal charges for the production of child pornography but had not yet been sentenced. Defense counsel wanted to question Hunt about a piece of discovery the State had given Defendant's counsel. However, the State made a motion in limine to preclude any questions concerning the underlying federal conviction. At the direction of the trial court, defense counsel read the transcript of a phone call obtained during discovery outside the presence of the jury,

> The federal jail snitch has his own charges concerning child sexual exploitation material. He has not been sentenced yet due to the Moore trial but getting at least 180 months. He was sending photos to an FBI undercover, and when he was debriefed to command (snitch was in the military) he was untruthful about how many photos, and he also destroyed the phone prior to his debrief.

The trial court ruled that "even if those facts are relevant, I'm going to find that the prejudicial value would outweigh any probative values as it relates to this case."

Defense counsel cross examined Hunt extensively including multiple questions about his guilty plea on federal charges, his maximum sentences, the fact that there were multiple charges, and the possibility that a federal judge could give him a downward variance for providing substantial assistance in this case. The only

restriction on the cross examination was the Defendant's inability to question Hunt about whether he had lied either to the military or police during the investigation of his own charges. Defendant contends that under *State v. Morgan*, Rule 608(b) allows for impeachment of a witness's character and acts that are indicative of the actor's character for untruthfulness, and he should have been able to question Hunt about his truthfulness in regard to his own charges. However, in *State v. Baldwin* we further explained the holding in *Morgan*,

> Rule 608(b) specifically allows the cross-examination of a witness with respect to specific conduct of the witness that indicates his character for truthfulness or untruthfulness if the conduct in question "is in fact probative of the truthfulness or untruthfulness and is not too remote in time" and **if "the conduct ... did not result in a conviction,"** *State v. Morgan,* 315 N.C. 626, 634, 340 S.E.2d 84, 89–90 (1986); N.C.G.S. § 8C–1, Rule 608(b) (1992), and **provided further that the "probative value of the evidence is not outweighed by the risk of unfair prejudice**, confusion of issues, or misleading the jury, and that the questioning will not harass or unduly embarrass the witness." *Morgan,* 315 N.C. at 634, 340 S.E.2d at 90; N.C.G.S. § 8C–1, Rule 403.

*State v. Baldwin*, 125 N.C. App. 530, 534, 482 S.E.2d 1, 4, (1997) (emphasis added).

In this case, the actions at issue resulted in a conviction for which Hunt was awaiting sentencing, making it inadmissible under 608(b). Additionally, the trial court weighed the probative value of eliciting an answer as to whether someone the jury already knew was convicted on multiple counts of producing child pornography might also lie or attempt to hide his behavior. The trial court then reasonably decided

that the additional information did not outweigh the possible prejudice of opening an entire line of questioning surrounding Hunt's various interactions with military and law enforcement during an unrelated investigation as well as concerns about hearsay when neither of the parties involved in the discovery transcript were testifying at the trial. Therefore, the trial court's decision to limit the cross-examination was not an abuse of discretion.

Furthermore, assuming *arguendo* the trial court abused its discretion by limiting Defendant's ability to cross examine Hunt, the error would have been harmless. The jury clearly was aware Hunt was guilty of multiple counts of producing child pornography. The weight the jury was going to give his testimony was not likely to be significantly impacted by additional evidence that he may have lied about the child pornography during the investigation. Additionally, significant evidence of Defendant's guilt existed separate and apart from the testimony Hunt provided, and any inability to impeach Hunt's honesty further by demonstrating he may have lied during his investigation does not overcome the weight of the evidence that incriminated Defendant in Baker's murder. *See State v. McClinton*, __ N.C. App. __, __, 922 S.E.2d 190, 197 (2025).

### III.   Conclusion

The trial court did not err in denying Defendant's motions to dismiss and submitting all issues to the jury when the state provided evidence of each necessary element. Additionally, the trial court did not abuse its discretion in limiting cross-

examination of a State witness when it determined the risk of prejudice outweighed the probative value. Finally, Defendant failed to preserve the issue of dying declarations. Therefore, we hold Defendant received a fair trial free from error.

NO ERROR.

Chief Judge DILLON and Judge GRIFFIN concur.

Report per Rule 30(e).